# No. 24-11080

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

JAIME VARGAS, and FRANCIS R. ALVAREZ,

*Plaintiffs-Appellants,*

v.

LINCARE, INC. and OPTIGEN, INC.,

*Defendants-Appellees.*

---

On Appeal From the United States District Court for the Middle District of Florida
Case No. 3:16-cv-01329-HLA-PDB
Henry Lee Adams, Jr., Senior U. S. District Court Judge

---

# APPELLANTS' OPENING BRIEF

---

Monica Miller
Daniel M. Cohen
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave., Suite 200
Washington, DC 20016
(202) 789-3960
monica@cuneolaw.com
danielc@cuneolaw.com

*Counsel for Appellants*

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES ........................................................1

STATEMENT OF THE CASE.............................................................1

    A.      Nature of the Case .............................................................1

    B.      Pertinent Facts ...................................................................2

          1.    The Defendants ..........................................................2

          2 .    The Plaintiffs..............................................................3

          3.    Defendants' Illegal Billing Practices .......................5

                a.Optigen Systematically Overbills for CPAP Batteries and Accessories Using Billing Codes for Ventilator Batteries and Accessories .............................................5

                b.   Optigen and Lincare Systematically Paid Kickbacks to "Technicians" Affiliated With Prescribers...............6

                c.Optigen Systematically Waived Copayments ..............9

i

d.   Lincare Routinely Shipped Accessories and Supplies
that Were Not Ordered by Prescribers or Patients.......11

C.   Pertinent Procedural History Below and Disposition by the District
Court  12

SUMMARY OF THE ARGUMENT ..........................................................13

STANDARD OF REVIEW ......................................................................14

ARGUMENT ...........................................................................................14

I.   The District Court Erred in Dismissing Plaintiffs' Upcoding and Kickback
Allegations.................................................................................................17

A.   Plaintiffs Have Chronicled Thirty-Three (33) Claims Pertaining to
Thirty-Two Patients Illustrating in Which Optigen Fraudulently "Upcoded"
CPAP Batteries and Accessories and Paid Illegal Kickbacks to Contract
Field Technicians ......................................................................................17

1.   There is No Plausible Explanation for the District Court's
Summary Rejection of Plaintiffs' Billing Data ...............................22

2.   A FCA Plaintiff is *Not* Required to Provide Billing Data and
*Also* Provide Indicia of Credibility for the Billing Data .................25

3.   Even if the District Court Was Somehow Permitted to
Completely Disregard Exhibit A, Exhibits C, D and E Were More

ii

than Sufficient to Establish Payments by the Government to Optigen for Upcoded Batteries and Battery Accessories and That Were Tainted by Kickbacks ........................................................................28

    B.    Plaintiffs' Factual Allegations *Also* Establish *Alternative* Indicia of Credibility, as to Plaintiffs' Upcoding and Kickback Allegations, to the Extent It is Relevant ....................................................................28

II.    There Were Sufficient Indicia of Reliability to Sustain Plaintiffs' Claims Relating to Copay Waivers and Shipment of Unordered Supplies .................31

    A.    Copayments, Which Is a Form of Kickback and a Violation of the AKS  and FCA...........................................................................31

    B.    Optigen and Lincare Fraudulently Shipped Unordered Supplies That Were Not Medically Necessary ...................................................34

CONCLUSION....................................................................................36

REQUEST FOR ORAL ARGUMENT .................................................38

CERTIFICATE OF COMPLIANCE.....................................................39

CERTIFICATE OF SERVICE ..............................................................40

# TABLE OF AUTHORITIES

**Cases**

*Armfield v. Gillis*, 2012 WL 12918277 (M.D. Fla. Oct. 18, 2012)    7

*Flanagan v. Bahal*, 2015 WL 9450826 (D.N.J. Dec. 22, 2015)    9 n.2, 10 n.3

*Glover v. Liggett Grp., Inc.,* 459 F.3d 1304 (11th Cir. 2006)    14

*Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318 (11th Cir. 2009)    24, 26 n.7

*U.S. ex rel.  Sharp v. E. Oklahoma Orthopedic Ctr.,* 2009 WL 499375 (N.D. Okla. Feb. 27, 2009)    9 n.2

*U.S. v. Halifax Hosp. Medical Center*, 2013 WL 6989775 (M.D. Fla. Nov. 18, 2013)    7

*United States ex rel. Atkins v. Mclnteer*, 470 F.3d 1350 (11th Cir. 2006)    14-15, 22-24

*United States ex rel. Bahnsen v. Boston Scientific Neuormodulation Corp.*, 2017 WL 6403864 (D.N.J. Dec. 15, 2017)    11

*United States ex rel. Gagne v. City of Worcester,* 565 F.3d 40 (1st Cir. 2009)    27 n.7

iv

*United States ex rel. Goodman v. Arriva Med., LLC*, 471 F. Supp. 3d 830(M.D. Tenn. 2020) — 9-10

*United States ex rel. Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) — 16

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693 (11th Cir. 2014)(unreported) — 15, 27 n.7, 30, 35

*United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217 (11th Cir. 2012) — 16

*United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48 (D.D.C. 2018) — 9 n.2, 10 n.3

*United States ex Rel. Walker v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349 (11th Cir. 2005) — 16, 30

*United States ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301 (11th Cir. 2002) — 15, 22-23

*United States ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003) — 5

*United States v. Adams*, 371 F. Supp. 3d 1195 (N.D. Ga. 2019) — 5

v

*United States v. Berkeley Heartlab*, 225 F. Supp. 3d 487 (D.S.C. 2016) — 9 n.2

*United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011) — 6-7

*United States v. Chang*, 2017 WL 10544289 (C.D. Cal. July 25, 2017) — 9 n.2

*United States v. Crescendo Bioscience, Inc.*, 2020 WL 2614959 (N.D. Cal. May 23, 2020) — 10 n.3

*United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998) — 7

*United States v. HPC Healthcare, Inc.*, 723 F. App'x 783 (11th Cir. 2018) — 26 n.6

*United States v. Inst. of Cardiovascular Excellence, PLLC*, 2015 WL 12866448 (M.D. Fla. Nov. 5, 2015) — 9 n.2

*United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000) — 7

*United States v. Robinson*, 2015 WL 1479396 (E.D. Ky. Mar. 31, 2015) — 5

*United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914 (8th Cir. 2014) — 30

vi

*United States ex rel. Troncoso v. Rego International, LLC*, 2018 WL 2220430 (S.D. Fla. May 15, 2018) — 30, 35

*United States ex rel. Bahnsen v. Boston Scientific Neuormodulation Corp.*, 2017 WL 6403864 (D.N.J. Dec. 15, 2017) — 35

**Statutes, Rules and Regulations**

28 U.S.C. § 1291 — 1

28 U.S.C. § 1331 — 1

31 U.S.C. § 3729 *et seq.* — 1

32 C.F.R. § 199.1 *et. seq.* — 33 n.9

41 U.S.C. § 1320a–7a(i)(6) — 31

42 U.S.C. § 1320a–7b(b)(2) — 2

70 Fed. Reg. 4858, 4864 — 7

Fed. R. Civ. P. 12(b)(6) — 1, 14

## JURISDICTIONAL STATEMENT

The United States District Court for the Middle District of Florida had jurisdiction pursuant to 28 U.S.C. § 1331 because the claims at issue presented federal questions arising under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

Appellants filed a Notice of Appeal on April 4, 2024.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as Appellants seek review of a "final decision" of a district court, in which the district court dismissed all claims.

## STATEMENT OF THE ISSUES

Did the district court err in holding, pursuant to Fed. R. 12(b)(6), that, in the operative Fourth Amended Complaint (the "Complaint" or "Compl."), Plaintiffs failed to state a claim upon which relief can be granted.

## STATEMENT OF THE CASE

### A. Nature of the Case

This is an action brought pursuant to the FCA. The defendants, Lincare, Inc. ("Lincare") and Optigen, Inc. ("Optigen") (collectively "Defendants") are vendors who sell durable medical equipment ("DME"), including certain devices

1

for treating patients with sleep disorders. Lincare is Optigen's corporate parent, having acquired Optigen in or around 2012. Plaintiffs-Appellants Jaime Vargas and F. Randall Alvarez ("Plaintiffs") are former employees of Defendants.

In the operative Fourth Amended Complaint, Plaintiffs allege four distinct schemes implemented by the Defendants to defraud the government. Certain of the schemes implicate the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a–7b(b)(2), violations of which are actionable under the FCA.

### B. Pertinent Facts

#### 1. The Defendants

Lincare has at all pertinent times been engaged in the business of providing oxygen, respiratory and other chronic therapy services to patients in the home, and also providing a variety of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") and home infusion therapies in certain geographic markets. The DMEPOS provided by Lincare includes a variety of home oxygen equipment. Among the respiratory equipment provided by Lincare is equipment for CPAP. Compl., ¶ 44, A-21. This equipment includes "CPAP," or continuous positive airway pressure, which is a device, and form of treatment, that uses mild air pressure to keep the airways open. Compl., ¶ 40, A-20.

2

Optigen describes itself as the "world leader" in respiratory therapy services to military service persons and military-affiliated civilians. Providing CPAP equipment, and CPAP-related services, to military personnel is the focus of Optigen's business. *Id.*, ¶ 45, A-21-22. In addition to the CPAP device itself, Optigen supplies patients with various accessories necessary to its use, including masks, seals, nasal pillows, headgear, and filters. Id.

Lincare acquired Optigen in 2011. Compl., ¶ 13, A-15. Thereafter, for administrative purposes, Optigen's business was considered a "region" within Lincare. *Id.,* ¶ 5, 8, A-13-14. But, instead of being a region defined by geography, it was defined by Optigen's military-focused business.

### 2. The Plaintiffs

Plaintiff Jaime Vargas has been a licensed respiratory therapist for over 35 years. He was "Health Care Services Manager" (1) from 2004-2011 for Lincare in an 8-state region in the Western United States, and (2) in 2011-12 for the Optigen "region" after Lincare's acquisition of Optigen. Compl., ¶¶ 4-5, A-13-14. Vargas principally performed a compliance function, as his responsibilities included the clinicians' "clinical training and location operational compliance with applicable Medicare and other regulatory standards, and with Lincare internal Policies and

procedures." *Id.* His responsibilities, both in the Colorado region, and the Optigen

region, were (1) "generally to evaluate operations, and look for any operational

areas that required improvement with respect to compliance and corporate

standards," and (2) involved regular "audits"[1] of patient files. *Id.*

Plaintiff Randy Alvarez spent 20 years with Optigen in different capacities:

he (1) served as a Contract Field Technician ("CFT") for Optigen for

approximately 15 years (from 2000-2015) on an independent contractor basis (he

was the first CFT Optigen ever retained), *Id.*, ¶ 7, A-14, and (2) served as "Health

Care Services Manager" for the Optigen region from 2015-2020 (the same position

Plaintiff Vargas had held in 2011-12). *Id.*, ¶ 8, A-14. His responsibilities as

"Health Care Services Manager" were substantially the same as those previously

---

[1] With respect to the audits, Vargas

> would not review every patient file, he would perform random audits
> of them periodically to ensure compliance. Patient files included
> billing correspondence, including the relevant "Certificate of Medical
> Necessity," a document signed by the prescribing provider containing
> clinical information that supports the need for each item. The patient
> file would also include the "authorization" for the item, authorizing
> payment by the relevant insurer, such as Tricare or Medicare.

Compl., ¶¶ 4-5,A-13-14. The same was true for Plaintiff Alvarez, when he
performed audits as Health Care Services Manager in the Optigen Region. *Id.,* ¶
10, A-14-15.

performed by Mr. Vargas in the same position. *Id.*, ¶ 9-10, A-14-15.

### 3. Defendants' Illegal Billing Practices

#### a. Optigen Systematically Overbills for CPAP Batteries and Accessories Using Billing Codes for Ventilator Batteries and Accessories

The term "upcoding" is commonly used in medical billing parlance to describe the practice of billing for a more expensive good or service than the one actually provided. *United States v. Adams*, 371 F. Supp. 3d 1195, 1212 (N.D. Ga. 2019) ("…if [Plaintiff] can show that [Defendants] … engaged in upcoding [their] services, such falsity is sufficient for an FCA claim") (quoting *United States v. Robinson*, 2015 WL 1479396, at *5 (E.D. Ky. Mar. 31, 2015)); *United States ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("upcoding is actionable under the FCA"). There was no particular dispute in the district court proceedings that upcoding is illegal, as it is well-settled that upcoding violates the FCA.

Plaintiffs allege, in considerable detail, that Optigen routinely bills Tricare (and other insurers) for ventilator batteries and related equipment designed for ventilators. As explained in the Complaint, ventilators and CPAP are very different types of equipment:

> Unlike a ventilator, CPAP and BiPAP only assist the patient with breathing, and cannot be set to completely take over the patient's breathing. Accordingly, CPAP and BiPAP devices are appropriate for

5

conditions that are not life-threatening, and for which interruption of respiratory support would not quickly lead to serious harm or death. Compl., ¶ 42, A-21. Accordingly, for ventilator users, batteries are *essential* equipment, as an interruption in respiratory support could be fatal. For CPAP users, they can be useful in certain circumstances, but are typically not essential.

Optigen falsely upcoded its CPAP batteries and accessories, using ventilator HCPCS codes, because (1) it enhanced Optigen's chances of obtaining reimbursement, because CPAP batteries and accessories were generally not covered and there were existing codes for ventilator batteries and accessories, and (2) it enabled Optigen to obtain a higher rate of reimbursement. Compl., ¶ 50, A-25.

Plaintiffs have provided thirty-three specific examples of instances in which Optigen billed CPAP batteries and accessories using specific HCPCS codes applicable to ventilators and ventilator accessories.

### b. Optigen and Lincare Systematically Paid Kickbacks to "Technicians" Affiliated With Prescribers

It is well-settled that it is illegal under the AKS to pay remuneration for the purpose of encouraging referrals. It is illegal to do so even if there is also a legitimate purpose for the remuneration, such as providing a service or facility to the payor. *See*, *e.g.*, *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011)

(AKS applies when *one* purpose of the remuneration was to obtain money for the referral of services or to induce further referrals); *United States v. McClatchey*, 217F.3d 823, 834-35 (10th Cir. 2000); *United States v. Davis*,132 F.3d 1092, 1094–95 (5th Cir. 1998); *see also* 70 Fed. Reg. 4858, 4864 ("Importantly, under the[AKS], neither a legitimate business purpose for the arrangement, *nor a fair market value payment*, will legitimize a payment if there is also an illegal purpose (*i.e.*, inducing Federal health care program business)") (emphasis added). *See also, e.g.*, *Armfield v. Gillis*, 2012 WL 12918277, at *1 (M.D. Fla. Oct. 18, 2012) (summary judgment denied even where relator contended that the defendants paid a doctor for referrals by paying him for goods and services "includ[ing]space and equipment rent[al] and payment for personal services, which the undisputed evidence of record demonstrate[d] were consistent with fair market value); *U.S. v. Halifax Hosp. Medical Center*, 2013 WL6989775, at *6 (M.D. Fla. Nov. 18, 2013) (denying summary judgment as to claims defendants falsely certified compliance with Stark Law, which prohibits payments for referrals to physicians).

Plaintiffs have expressly pleaded that one of the purposes of Optigen's payments for "setup fees" to CFTs is to encourage them to refer patients. Compl. ¶ 80, A-31 ("Optigen intentionally recruits CFTs, and encourages them to cause their

7

medical practices to prescribe CPAP and to order it from Optigen, and touts the setup fees in order to entice them to refer more patients.").Plaintiffs have further pleaded that "Optigen systematically tracks its remote clinicians in a database," and "[s]ome CFTs perform as many as 150 installations in a single quarter." *Id.*, ¶ 81, A-31.

Plaintiffs have specifically pleaded that, for each of the thirty-three specific claims described, a Setup fee was paid, and that it was paid at least in part to induce further referrals from the CFTs. Compl., ¶¶ 90, 93, 96, 100, 103, 106, 109, 112, 115, 118, 121, 124, 127, 130, 133, 136, 139, 142, 145, 148, 151, 154, 157, 160, 163, 166, 169, 172, 175, 178, 181, 184, A-33-54.

Plaintiffs have pleaded that the "fees were *never* uniform." Compl., ¶ 74, A-30. The amount of the fee is largely determined by how prolific a referral source the CFT is. *Id.*, ¶¶ 74-77, A-30-31

To the extent is matters, the fees *are* more than the fair market value of the services. *Id.*, ¶¶ 78-79, A-31. Respiratory therapists have never made $50/hour (much less $100 or $200 per hour) *anywhere at any time*, and $50 is the *minimum* amount that Optigen *ever* paid for setups that take a *maximum* of 45 minutes. *Id.*

### c. Optigen Systematically Waived Copayments

Systematically waiving copayments is simply illegal, and has been for a very long time. In fact, the AKS expressly defines illegal "remuneration" as including "the waiver of coinsurance " amounts. 41 U.S.C. § 1320a–7a(i)(6). Copay waivers (without a showing of hardship) are, in essence, kickbacks to the patient and are violations of the AKS, and are actionable under the FCA.[2]

Following the 2010 amendments to the AKS, violations of the AKS violate the FCA as a matter of law, with or without an express certification or a showing of materiality. *See United States ex rel. Goodman v. Arriva Med., LLC*, 471 F. Supp. 3d 830, 840-41 (M.D. Tenn. 2020); (because AKS violations are "material" as a matter of law, defendants are not entitled to take discovery of the

_____

[2] *See, e.g., United States v. Inst. of Cardiovascular Excellence, PLLC*, 2015 WL 12866448 (M.D. Fla. Nov. 5, 2015) (sustaining claim based on systematic copay waivers under AKS and FCA).*Accord, e.g., United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48 (D.D.C. 2018) (allegation that pharmaceutical company waived patient copays to induce physicians to use its lab services sufficiently stated AKS and FCA violation); *United States v. Chang*, 2017 WL 10544289, at *7-8 (C.D. Cal. July 25, 2017) (same); *United States v. Berkeley Heartlab*, 225 F. Supp. 3d 487 (D.S.C. 2016) (waiver of copays is "remuneration" for purposes of AKS); *Flanagan v. Bahal*, 2015 WL 9450826 (D.N.J. Dec. 22, 2015); *U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.,* 2009 WL 499375, at *23 (N.D. Okla. Feb. 27, 2009) (same).

Government  pertinent to whether defendants' copay waivers were "material" to the government). When copay waivers are "routine," and the Relator has adequately described the scheme, moreover, there are sufficient indicia of reliability to support an inference that claims were submitted for  patients for whom copayments were waived.[3]

Plaintiffs have pleaded that Optigen systematically waived patient copayments without investigating whether the patient had financial need. Specifically, plaintiffs have pleaded that)(1) Optigen, historically**,** asked CFTs to encourage "patients to complete [the copay waiver forms included in patient "setup" packets] … and systematically waived copays," Compl., ¶ 58, A-27, and

---

[3] *See, e.g., United States v. Crescendo Bioscience,  Inc.*, 2020 WL 2614959, at *8, *10 (N.D. Cal. May 23, 2020) (noting that pleading "reliable indicia that lead to a strong inference that claims were actually submitted" is sufficient in the Ninth Circuit  as it is in the Eleventh, and concluding plaintiff "has alleged great detail concerning the alleged  patient fee-waiver scheme, including a specific period of time. It has given Defendants fair notice  of the particular misconduct alleged"); *Riedel*, 332 F. Supp. 3d at 80 (where Relator adequately  describes widespread copay waiver scheme, Relator is "not required to 'affix actual claims'")(citation omitted); *Flanagan*, 2015 WL 9450826, at *3, *8-9 (noting that "reliable indicia  that lead to a strong inference that claims were actually submitted" is sufficient in the Third Circuit  as it is in the Eleventh, and holding that copay waiver claim adequately pleaded without reference  to exemplars).

(2) Optigen did "not require[]patients to provide any financial information to establish their financial hardship." Compl., ¶ 59, A-28. Plaintiffs provided an exemplar waiver form, which required the patient to only summarily state that they were enduring some unspecified financial "hardship" without providing anything more specific. Compl. ¶ 58, Exh. C, A-64.

### d. Lincare Routinely Shipped Accessories and Supplies that Were Not Ordered by Prescribers or Patients

It is axiomatic that, for a claim for DMEPOS to be reimbursable by the federal government through Medicare or Tricare, the items must be "medically necessary." If the items are *not* needed, or even *ordered*, there is simply no basis to ship them and bill the federal government for them. Compl., ¶ 28, A-18 (The service provider or supplier (as applicable) certifies on the CMS 1500 that the items billed on the form were "medically indicated and necessary for the health of the patient"). *See also, e.g.*, *United States ex rel. Bahnsen v. Boston Scientific Neuormodulation Corp.*, 2017 WL 6403864 (D.N.J. Dec. 15, 2017) (summary judgment denied in FCA case where defendant "fail[ed] to obtain valid physician orders before submitting a claim to the Government" for shipment of adhesive patches). There can be little question that shipments of unrequested supplies, in response to no order, and not requested by the patient or anyone else, are "false."

11

Plaintiff Vargas became aware of auto-shipping largely from calls from irate patients, as well as from his visits to Lincare locations during which he witnessed actual patient complaints. Compl., ¶¶ 67-68, A-29. The Complaint further alleges: "Relator Vargas heard many either irate phone calls, and witnessed actual visits to the locations by, irritated patients who complained about the back-stock of supplies they keep receiving every month from Lincare or Optigen (although it was many). When asked if they ever spoke with anyone from the company prior to these shipments being made, the response was usually 'NO.' In many instances, a call would be made to the patient and a message would be left on the patient's answering machine. If the patient did not respond to the message, the supplies would be shipped. In most cases, the extra supplies would not be taken back (or refunded to Medicare/Tricare) because no supply item can be returned if 30 days has past." *Id.* Plaintiff Vargas "would instruct Lincare/Optigen staff that supplies are only to be shipped when actually ordered by the patient," but "due to the strong financial incentives, the Relator believes his instructions were disregarded."

### C. Pertinent Procedural History Below and Disposition by the District Court

Plaintiff Vargas commenced this action with the filing of the initial complaint in 2014. This action remained sealed until approximately November 20,

12

2020, pending review by counsel for the government.

The district court granted a motion to dismiss (asserted against the then-operative Second Amended Complaint filed by Plaintiff Vargas and Plaintiff Alvarez) on October 5, 2022.

Plaintiffs repleaded, and the operative Fourth Amended Complaint, A-12, was filed on November 15, 2022.

The Defendants moved to dismiss. Pursuant to an order (the "Order") entered March 6, 2024 (A-151), the district court granted the Defendants' Motion to Dismiss, disposing of the entire action below.

## SUMMARY OF THE ARGUMENT

First, the district court erred in holding, with respect to Plaintiffs' allegations concerning battery upcoding and kickbacks, that Plaintiffs did not adequately plead billing data with the specificity required to state a claim under the FCA. Plaintiffs provided thirty-three detailed records of payments made (and not merely services provided), which were more than sufficient to satisfy Plaintiffs' pleading burden under the FCA.

Second, the district court erred in holding that Plaintiffs also failed to satisfy their pleading burden under the FCA, as to all four claims of wrongful conduct,

13

through the alternative means of pleading facts supporting an inference of credibility that false claims were submitted to the government. Plaintiffs, as long-tenured employees with broad managerial responsibility, had intimate knowledge of the wrongful practices at issue.

## STANDARD OF REVIEW

An appellate court "review[s] de novo [a] district court's grant of  motion to dismiss under [Rule] 12(b)(6) for failure to state a claim, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Glover v. Liggett Grp., Inc.,* 459 F.3d 1304, 1308 (11th Cir. 2006).

## ARGUMENT

Claims brought under the FCA are subject to Fed. R. Civ. P. 9(b), which requires that the circumstances constituting fraud be pleaded with particularity. There are two ways a plaintiff asserting claims under the FCA may meet its pleading burden.

First, a plaintiff may do so through "by the inclusion of certain information in the complaint as to specific claims for payment, such as the amounts of charges, actual dates, billing practices or policies." *United States ex rel. Atkins v. Mclnteer*,

14

470 F.3d 1350, 1358-59 (11th Cir. 2006)). Accord, *e.g., United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx.  693, 704 (11th Cir. 2014)(unreported) (a relator can provide "exact billing data—name, date, amount, and services rendered" – for the false claim(s) in question). Rule 9(b) "does not mandate all of [these categories of] information for [each] alleged claim," but "some of [the] information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *United States ex. rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1312 n.21 (11th Cir. 2002). In considering whether such allegations are sufficient the key is "specific claims for payment" - it is not sufficient to merely plead details concerning the services or goods provided (such as a medical treatment), it is critical to show that the goods or services were actually *billed to, and paid by,* the federal government.

Second, and alternatively, a plaintiff may meet its pleading burden (*i.e.,* as an *alternative* to providing billing data) by making allegations that possess  the "required indicia of reliability that a false claim was actually submitted" to the government. *Mastej*, 591 Fed. Appx at 704.  The latter is satisfied where a relator has "direct, first-hand knowledge of the defendants'  submission of false claims gained through [his] employment with the defendants." *Id.* at 705. In  this regard,

15

a Relator may "leave out particularities of the submissions of a false claim if the complaint alleges personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012). When a relator is an insider with firsthand knowledge of violations, he or she provides sufficient indicia of reliability to satisfy the Rule 9(b) standard without going into detail about each of the false claims presented. *United States ex Rel. Walker v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005); *United States ex rel. Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429, 2003 WL 22019936, at *4–5 (11th Cir. Aug. 15, 2003).

In the action below, Plaintiffs alleged four wrongful courses of conduct by the Defendants, all described above:

1. Illegal upcoding of CPAP Batteries and Accessories – which were billed using codes applicable to (more expensive) ventilator batteries and accessories, rather than the codes applicable to CPAP equipment;

2. Kickbacks, paid in the form of, "Setup Fees" paid to "Contract Field Technicians" who were often affiliated with medical practices;

3. The systematic waiver of Copayments without examination of financial need; and

4. The shipping of unordered CPAP supplies to patients who did not order or want them.

With respect to Plaintiffs' upcoding and kickback allegations, Plaintiffs

16

provided specific billing data to satisfy their pleading burden. Alternatively, Plaintiffs *also* pleaded facts sufficient to show sufficient indicia of credibility.

With respect to plaintiffs' allegations concerning systematic copay waivers and shipping of unordered supplies, Plaintiffs pleaded facts sufficient to show sufficient indicia of credibility.

The district court expressly held that the billing data provided by Plaintiffs was insufficient to meet Plaintiffs' billing burden A-165-66. The district court implicitly[4] held that the indicia of credibility pleaded and suggested by Plaintiffs were also insufficient.

## I. The District Court Erred in Dismissing Plaintiffs' Upcoding and Kickback Allegations

### A. Plaintiffs Have Chronicled Thirty-Three (33) Claims Pertaining to Thirty-Two Patients Illustrating in Which Optigen Fraudulently "Upcoded" CPAP Batteries and Accessories and Paid Illegal Kickbacks to Contract Field Technicians

Plaintiffs provided a detailed narrative with respect to thirty-three (33) exemplar claims, and considerable additional factual material, with respect to

---

[4] The district court did not expressly address whether Plaintiffs had adequately pleaded sufficient indicia of reliability as an alternative means of satisfying their pleading burden.

allegations relating to (1) upcoding of batteries and battery supplies, and (2) payment of kickbacks to CFTs.

Plaintiffs describe approximately thirty-three (33) actual claims (pertaining to thirty-two patients) submitted to the Government in which batteries and/or battery supplies were illegally upcoded, and pursuant to which illegal kickbacks were paid to CFTs. With respect to these two fraudulent practices, there is no need to consider whether there are sufficient "alternative indicia of reliability," as Plaintiffs have pleaded specific claims – claim numbers, dates, and amounts.

Much of the claims data is derived from a data set attached as "Exhibit A" to the Complaint. A-58. Plaintiffs indicated to the district court that this data set was "provided to Plaintiffs by the Government, and represented by the Government to be from the Center for Medicaid Services ("CMS")." A-124. Exhibit A contained the following data fields:  Care Date Claim Record, Claim Accept Date, Line Item Amount Paid, Patient Identifier (a dummy variable just to clarify patients for whom more than one item was paid), and Procedure Code. A-59-60.

Other data points are derived from records of Optigen obtained by Plaintiffs (and, in most if not all respects, appended as Exhibits B-H to the Complaint).

18

Exhibits D, E and F, A-65-73, are plainly labeled billing records from Optigen under the header "Payments Created by Auto Post." Data fields include: check number, check date, patient ID, patient name (redacted) and CPT (HCPS) code and amount.

*Many* of the claim exemplars are correlated in both (1) data provided by the government to Plaintiffs, and (2) data retrieved by the Plaintiffs from Defendants' records. These include those patients identified as patients C, D, E, F, G, H, N and O. for whom some amounts actually paid by the government to Optigen are reflected *both* in the government's records and records obtained by Plaintiffs.

Plaintiffs have described thirty-three (33) specific claims for thirty-two (32) unique patients (identified as Patients A through FF) submitted by Optigen to Tricare for batteries and battery-related supplies, and in which "setup fees" were paid to CFTs. We provide an example of the narrative:

> 120. Patient K, at the time serving in the United States Army and residing in El Paso, TX, was being treated by a physician for obstructive sleep apnea as of October 25, 2011.
>
> 121. At the time that Patient K first began using CPAP equipment provided by Optigen, Optigen paid a Setup Fee to a CFT. The Setup fee was paid at least in part to encourage the referral of business to Optigen, and, as such, was illegal under the AKS, and rendering all related claims for reimbursement of DME by Optigen violative of the AKS and actionable under the FCA.

122. On October 25, 2011, Patient K's physician ordered DME from Optigen. Between October 25 and November 23, 2011, Optigen submitted a claim (Claim Record No. 2011300NC998281437385), for payment to United Healthcare (Military & Veterans division, which, at the time, was functioning as administrator for the Tricare West region) for the following items (1) A4611 (heavy duty battery for patient-owned ventilator), (2) A4612 (battery cables for patient-owned ventilator), and (3) A4613 (battery charger for patient-owned ventilator). The claim was accepted on November 23, 2011 in the total amount of $418.49, and paid within the following month in that amount. The claim was fraudulent because Optigen does not sell, and never provided to the patient, a battery or battery accessories for a ventilator. CPAP batteries and battery accessories are less expensive than those designed for ventilators and the Government paid more than it should have had to pay as a result of the improper billing.

Compl., ¶¶ 120-22, A-40.

For 30 of 32 patients (Patients A through EE), Plaintiffs provided the amounts paid, the dates of service, and the dates claims were accepted. For several patients, Plaintiffs have further provided the precise dates the claims were paid and the check numbers. *See, e.g.,* Compl. ¶¶ 98, 101, 104, 107, 110, 113, 131, 134, 137, A-34-44.

Plaintiffs have gone further than pleading merely "amounts of charges" to patients and "actual dates" of medical services provided to patients. *Atkins*, 470 F.3d at 1358. Plaintiffs have included, for the vast majority of exemplars, the actual *claim numbers* from government records, as well as which branch of service

20

the patient was in, the Tricare administrator that processed the claim, and where the patient was stationed, and *when the claim was paid*. *See*, *e.g.*, Compl., ¶¶ 120, 122, A-40.

Plaintiffs have also specified how each claim was fraudulent, indicating that the Government paid more than it would have paid if Optigen had billed at rates applicable to CPAP batteries, and that Optigen illegally paid kickbacks designed at least in part to steer referrals, which renders all billing fraudulent under the FCA. *See*, *e.g.*, Compl., ¶¶ 121-22, A-40.

Plaintiffs have specified how the government was harmed by the billing for batteries and battery accessories using ventilator codes. Plaintiffs have alleged that the Government was harmed by having paid higher prices for batteries and battery accessories than it would have had to pay if the correct codes had been used. *See*, *e.g.*, Compl. ¶ 122, A-40.

Plaintiffs have also specified the relevant "billing practices or policies."[5]

---

[5] *See, e.g.,* Compl. ¶ 50, A-25 ("Optigen systematically miscoded the CPAP batteries, charges and cables under the HCPCS codes applicable to ventilator batteries and battery accessories" in order to "obtain a higher rate of reimbursement"); ¶ 84, A-32 ("Defendants knowingly made excessive payments

*Atkins*, 470 F.3d at 1358.

Plaintiffs have provided the foregoing billing data to support their allegations that defendants falsely upcoded its CPAP batteries and accessories, using ventilator HCPCS codes, and that Optigen paid kickbacks styled as "Setup Fees" for every CPAP patient. For the reasons stated below, Plaintiffs easily satisfied the requirements for pleading that specific false "claims" occurred in both respects.

### 1. There is No Plausible Explanation for the District Court's Summary Rejection of Plaintiffs' Billing Data

The district court cited *Clausen* and *Atkins* as examples of what it believed were dispositive authority for the insufficiency of the factual allegations in the Complaint. But neither is remotely comparable to the matter at bar.

In *Clausen*, the plaintiff contended that the defendant laboratory testing company billed the government for unneeded tests, but never came close to identifying anything (fraudulent or otherwise) that was billed to the government:

> in Clausen's First Amended Complaint, he described the various schemes LabCorp allegedly implemented to generate unneeded or duplicative medical tests on unsuspecting LTCF patients. He even

---

and provided gifts to CFTs and others as financial inducement for patient referrals").

22

provided three LTCFs' patient lists for a few years and a handful of patients' lab results and standing orders to illustrate the tests LabCorp had performed. This set the stage for the consummation of this alleged nefarious plot to recover unjustified amounts of taxpayer money. But, as to the plot's execution, Clausen merely offers conclusory statements, and does not adequately allege when—or even if—the schemes were brought to fruition. He merely alleged that "these practices resulted in the submission of false claims for payment to the United States." No amounts of charges were identified. *No actual dates were alleged. No policies about billing or even second-hand information about billing practices were described, other than to state that electronic HCFA Form 1500s with medical test codes were used*. No copy of a single bill or payment was provided.

290 F.3d at 1312 (emphasis added). In this case, in contrast, Plaintiffs have

provided dates of payments, dates of service, precise services provided, amounts

paid by the government, check numbers, and check dates.

In *Atkins*, the plaintiff alleged that the defendant had billed for psychiatric

services to patients at skilled nursing facilities that were, inter alia, (1) not

rendered, (2) not necessary, (3) upcoded and (4) provided with substandard levels

of care. The *Atkins* plaintiff did go as far as to plead details concerning medical

*procedures*,  but failed to identify a single *claim*:

Atkins …cites particular patients, dates and corresponding *medical records for services* that he contends were not eligible for government reimbursement. Just like the *Clausen* plaintiff, though, Atkins fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes" (emphasis added)

23

470 F.3d at 1358-59 (emphasis added). Here, plaintiffs do not rely on any medical records. All of the billing data cited is, actually, billing data. This includes dates of payments, dates of service, precise services provided, amounts paid by the government, check numbers, and check dates.

Similarly, in *Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1328 (11th Cir. 2009), cited elsewhere in the Order, the plaintiff failed to identify a single claim. *Id.* at 1328 ("[T]he Complaint *does not allege the existence of a single actual false claim*. In fact, we are unable to discern from the complaint a specific person or entity that is alleged to have presented a claim of any kind, let alone a false or fraudulent claim").

The plaintiffs in *Clausen, Hopper* and *Atkins* did not, in the words of this Court, provide *any claims information.*

It is difficult to comprehend how the district court could dismiss a claim with thirty three billing exemplars, illustrated with data fields such as dates of payment, check dates, check numbers, government claim numbers, amounts paid and HCPCS codes, with cases in which the plaintiffs provided absolutely zero billing data. The district court's failure is inexplicable.

24

### 2. A FCA Plaintiff is *Not* Required to Provide Billing Data and *Also* Provide Indicia of Credibility for the Billing Data

Defendants vociferously argued in their reply brief below that the district court should disregard Exhibit A to the complaint, a data set, described above, provided by the government to Plaintiffs. A-142-45. The Defendants did not argue that the information was inaccurate nor that it was not claims data – they only alleged that its source was not adequately identified in the complaint and, for some reason, should not be considered.

In its Order, the district court recited these contentions that the Defendants asserted as to Exhibit A, stating that the Defendants contended that the exhibit "does not include supporting allegations, fails to identify the underlying documents used to create the data appendix, does not connect the data appendix to an effort by Optigen to have claims paid by the government." Order, at A-165. The district concluded it "agreed" (A-165) with Defendants' contentions that Exhibit A could not be considered without some additional indicia of reliability.

But there is no such authority that the district court could have cited, and there  is no such rule. Notably, the district court did not cite to any case law

holding that billing data pleaded by a FCA must *also* be accompanied by circumstantial evidence of credibility. There is none. The Defendants repeatedly argued below, and apparently had some success in confusing the district court, that a plaintiff must plead billing data *and* provide additional indicia of reliability.[6] But that is not the law, in the Eleventh Circuit or anywhere else.

The district court did recite three cases, which it accurately attributed to appearing in Defendants' Reply brief, but none of them remotely purports to stand for such a proposition. These cases stand only for the requirement that billing data be actual billing data (*i.e.,* records of amounts billed to and paid for by the government), and not merely some sort of other record relating to a good or service (like a medical record or an employee time sheet) relating to something that might have been billed to the government.[7] These cases do not

[6] Def. Mot. at 5, A-89 (suggesting that there are no additional indicia of reliability because Plaintiffs were not employed in billing departments);  Def. Mot. at 23, A-107 (In discussion of the thirty-three claim exemplars, arguing that "Nothing in the [Complaint], in other words, provides a shred of any "indicia of reliability" about any "actual false claim . . . submitted" to the government; Def. Mot. at 24, A-108 (citing *United States v. HPC Healthcare, Inc*., 723 F. App'x 783, 789 (11th Cir. 2018)) (arguing that "claim must have some 'indicia of reliability'").

[7] In *Hopper*, the plaintiff alleged a campaign of false marketing of a product that he alleged was paid for by the government, but made no serious attempt to link the

indicate that a plaintiff who provides claim numbers, dates, check numbers, and amounts gets kicked to the curb if the source of the billing data is not adequately identified to the opposing party's satisfaction.

Defendants did not suggest below, and probably will not suggest here, that the federal claim numbers, payment amounts, and other data in exhibit A is fabricated. They did not move to strike it. And the district court did *not* strike it. It is part of the record, and absent some rather unusual facial indicia of *falsity,* the data would have to be accepted as true even if it were "doubtful in fact." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

false marketing to any payment for anything by the government. The Court concluded that "the Complaint *does not allege the existence of a single actual false claim*. In fact, we are unable to discern from the complaint a specific person or entity that is alleged to have presented a claim of any kind, let alone a false or fraudulent claim."  588 F.3d at 1326. In *United States ex rel. Gagne v. City of Worcester,* 565 F.3d 40 (1st Cir. 2009), the plaintiff alleged how some city employees generated falsified time sheets. But the time records were not submitted to the federal government, and there was no description of anything billed to the federal government. *Id. at* , 47-48 ("Relators .. fail to connect the only falsity or fraud for which they provide any detail—the allegedly fraudulent time sheets—to an effort to get a false claim paid or approved by the government").
It is not entirely clear why the district court also cited *Mastej* in this context. The plaintiff in *Mastej did not attempt* to plead claims data. The claim was sustained because the Plaintiff had adequately pleaded alternative indicia of reliability. The case is not relevant to the question of what constitutes sufficient billing data.

27

And, of course, the data set is *not doubtful at all*, and the Defendants know this. It was provided by the U.S. Attorney's office to the undersigned. And several of its data points are independently corroborated by many data points in Exhibits D, E and F, which are billing records from Optigen. Notably, the Defendants did not run into court kicking and screaming that the evidence was falsified, which they could have (and would have) done if it were not accurate.

> **3. Even if the District Court Was Somehow Permitted to Completely Disregard Exhibit A, Exhibits C, D and E Were More than Sufficient to Establish Payments by the Government to Optigen for Upcoded Batteries and Battery Accessories and That Were Tainted by Kickbacks**

As noted above, Exhibits C, D and E to the Complaint are *also* billing data. They are billing records from Optigen that show check numbers, dates of checks, and amounts of payments for particular services (identified by HCPCS code) paid for by the government. Neither the district court nor the Defendants  below, proffered any explanation for what, if anything, was insufficient with this billing data.

> **B. Plaintiffs' Factual Allegations *Also* Establish *Alternative* Indicia of Credibility, as to Plaintiffs' Upcoding and Kickback Allegations, to the Extent It is Relevant**

It is also clear that, even if there were *not* sufficient claims data provided,

there would, *alternatively,* be considerable indicia of reliability to support plaintiffs' allegations that false claims were submitted that reflect upcoding of batteries and battery supplies, and that were tainted by kickbacks.

With respect to batteries and battery accessory billing, both Plaintiffs, as "Health Care Services Manager" for  Optigen, had open access to patient files, and part of their duties included regularly performed "audits" of patient files, including "setup packages" sent to CFTs upon setup of CPAP equipment."  Compl., ¶¶ 5, 10, A-13-15. Plaintiffs have pleaded that "[p]atient files included billing correspondence, including the relevant "Certificate of Medical Necessity," a document signed by the prescribing provider containing clinical information that supports the need for each item. The patient file would also include the "authorization" for the item, authorizing payment by the relevant insurer, such as Tricare or Medicare."  *Id*. It is further evident that Plaintiffs had access to a variety of different billing data because *they have retrieved it and filed it* with the Complaint. *See* Exhibits B through H, A-61-84, 117-19. How could the Plaintiffs have not had access to billing records if they were able to retrieve them and file them in this action?

With respect to Setup Fees, as "Health Care Services Manager" for

29

Optigen, both Plaintiffs' duties included compliance review and management of the work of the CFTs.  Compl., ¶¶ 5, 9, A-13-14. Plaintiff Alvarez, additionally, *was* a CFT (in fact, the very first CFT) for 15 years. *Id*., ¶¶ 6-7, A-14, and no person on the planet has more knowledge about Optigen's referral fees than Alvarez.

In *Mastej*, in comparison, this Court found that sufficient "indicia of reliability" were provided by a relator who acted  as both vice president and CEO of defendants, *accessed* information about billings, revenues, and payor mix, and attended meetings where billing was discussed. 591 Fed. Appx. at 708. *Accord, e.g., Walker*, 433 F.3d at 1360 (relator was a nurse who was told about billing practices by an  office administrator); *United States ex rel. Thayer v. Planned Parenthood of the Heartland,* 765  F.3d 914, 919 (8th Cir. 2014) (relator's role as "*center manager* gave her access to Planned  Parenthood's centralized billing system") (emphasis added); *United States ex rel. Troncoso v. Rego International, LLC*, 2018 WL 2220430, at *3-4 (S.D. Fla. May 15, 2018) (salesperson, not billing specialist, had sufficient knowledge that DMEPOS was fraudulently billed to Medicare).  Thus, someone with managerial responsibility with an oversight function,  including access to and knowledge about billing, will have the

30

sufficient "indicia of responsibility"  to plead actionable claims. But perhaps Plaintiffs' access to, and knowledge of, this information, such as  authorizations from Tricare and related correspondence, and aggregate accounting records reflecting billing to Tricare, is that *they were able to retrieve exemplars*, put them in the Complaint.

## II.    There Were Sufficient Indicia of Reliability to Sustain Plaintiffs' Claims Relating to Copay Waivers and Shipment of Unordered Supplies

Plaintiffs have not pleaded specific claims data with respect to their claims of illegal copayment waivers and shipping of unordered supplies. But Plaintiffs certainly pleaded sufficient "indicia of reliability" that false claims indeed were submitted, which is sufficient within the Eleventh Circuit.

### A. Copayments, Which Is a Form of Kickback and a Violation of the AKS  and FCA

Systematically waiving copayments is simply illegal, and has been for a very long time.  In  fact, the AKS expressly defines illegal "remuneration" as including "the waiver of coinsurance "  amounts. 41 U.S.C. § 1320a–7a(i)(6). Copay waivers (without a  showing of hardship) are, in essence, kickbacks to the patient

31

and are violations of the AKS, and are actionable under the FCA.[8]

As in the litany of similar cases, cited above, Plaintiffs have pleaded that)(1) Optigen, historically**,** asked CFTs to encourage "patients to complete [the copay waiver forms included in patient "setup" packets] … and systematically waived copays,**"** Compl., ¶ 58, A-27, and (2) Optigen did "not require[]patients to provide any financial information to establish their financial hardship.**"** Compl., ¶ 59, A-28. Plaintiffs provided an exemplar waiver form, which required the patient to only summarily state that they were enduring some unspecified financial "hardship" without providing anything more specific. Compl. ¶ 58, A-27, and Exh. C, A-63. Nothing more is required to state a claim.

But even if some express certification or showing of "materiality" were still required, Plaintiffs have pleaded in the Complaint that Defendants certified in their Medicare enrollment packages that they would comply with applicable laws.[9] Plaintiffs have further pleaded that (1) to become a DME supplier for

---

[8] *See* cases cited in Note 2, *supra,* and accompanying text.

[9] Defendants agreed "to abide by the Medicare laws, regulations and program instructions that apply to" the provider, to "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare"; and to "not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

32

Medicare or Tricare, one must expressly certify compliance with the AKS,[10] and

(2) Lincare has *at least twice* certified in "Corporate Integrity Agreements" with

the federal government, following FCA actions by the Government, that, among

other things, it would remain in compliance with the AKS and other relevant

laws.[11] Finally, there can be little question that systematic copay waivers are

---

Compl., ¶ 31, A-18-19. Tricare's requirements were similar. Compl. ¶ 34, A-19
(citing 32 C.F.R. § 199.1 *et. seq.*).

[10] Compl., ¶ 31, A-18-19. DMEPOS suppliers must complete a CMS Form 855S
(Medicare Enrollment Application for Durable Medical Equipment, Prosthetics,
Orthotics, and Supplies). In this form, suppliers must certify, among other things:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to this supplier. The Medicare laws,
> regulations, and program instructions are available through the
> Medicare contractor. I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal anti-kickback
> statute and the Stark law), and on the supplier's compliance with all
> applicable conditions of participation in Medicare.

https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855s.pdf

[11] Compl. ¶ 31, A-18. *See*: (a) "OIG SETTLES LARGEST EVER CIVIL
  MONETARY PENALTY CASE," [HHS] OIG
News (May 15, 2006), available at:
  https://oig.hhs.gov/publications/docs/press/2006/lincare051506.pdf\;
(b) "Corporate Integrity Agreement Between The Office Of Inspector General of
the Department of Health and Human Services and Lincare Holdings Inc. and
Lincare Inc." (May 15, 2006), available at:
https://oig.hhs.gov/fraud/cia/agreements/Lincare_Holdings_Inc_05152006.pdf

"material" to Medicare and Tricare, as evidenced by (1) a 1994 HHS OIG "Fraud Alert" excerpted at length in the Complaint at ¶ 54, A-26, and (2) a statement in the 2013 Tricare Provider Handbook, quoted in the Complaint, warning that one marker of fraud on the system is "[a] pattern of waiver of beneficiary (patient) copayment, cost-share, or deductible." Complaint, ¶ 57, A-27. Everyone participating in Medicare and Tricare promises, implicitly and explicitly, not to pay kickbacks. And everyone knows this, including Defendants.

### B. Optigen and Lincare Fraudulently Shipped Unordered Supplies That Were Not Medically Necessary

If DMEPOS items are *not* needed, or even *ordered*, there is simply no basis to ship them and bill the federal government for them. Compl., ¶ 28, A-17-18 (The service provider or supplier (as applicable) certifies on the CMS 1500 that

---

(c) "Durable Medical Equipment Provider Lincare Pays $5.25 Million to Resolve False Claims Act Allegations," U.S. Attorney's Office, Southern District of Illinois, available at:
   - https://www.justice.gov/usao-sdil/pr/durable-medical-equipment-provider-lincare-pays-525-million-resolve-false- claims-act ; and
(d) "Corporate Integrity Agreement Between The Office Of Inspector General of the Department of Health and Human Services and Lincare Holdings Inc. and Lincare Inc." (Aug. 2, 2018), available at:
https://oig.hhs.gov/fraud/cia/agreements/Lincare_Inc_08092018.pdf

the items billed on the form were "medically indicated and necessary for the health of the patient"). *See also, e.g.*, *United States ex rel. Bahnsen v. Boston Scientific Neuormodulation Corp.*, 2017 WL 6403864 (D.N.J. Dec. 15, 2017) (summary judgment denied in FCA case where defendant "fail[ed] to obtain valid physician orders before submitting a claim to the Government" for shipment of adhesive patches). There can be little question that shipments of unrequested supplies, in response to no order or request, are "false."

With respect to auto-shipping, Plaintiff Vargas has a "direct, first-hand knowledge of the defendants' submission of false claims gained through [his] employment with the defendants," *Mastej*, 591 Fed. Appx. at 705, as he was a manager in the Lincare system for eight (8) years, with, principally, compliance responsibilities. Compl., ¶¶ 4-5, A-13-14 ("operational compliance with applicable Medicare and other regulatory standards, and with Lincare internal Policies and procedures"). He was in a perfect position to be aware of, and to address, compliance issues, including shipping of unwanted supplies. Vargas describes in some detail how he became aware of auto-shipping largely from calls from irate patients, as well as from his visits to Lincare locations during

35

which he witnessed actual patient complaints. Compl., ¶¶ 66-67, A-29.[12] Plaintiff Vargas "would instruct Lincare/Optigen staff that supplies are only to be shipped when actually ordered by the patient," but "due to the strong financial incentives, the Relator believes his instructions were disregarded." Compl., ¶ 69, A-30. These allegations are at least as strong as those deemed sufficient in *Mastej* and *Troncoso*, and are more than sufficient to give this claim the indicia of credibility that is required.

## CONCLUSION

For the foregoing reasons, this Court should vacate in its entirety the district court's Order dismissing Plaintiffs' Fourth Amended Complaint, and remand this action to the district court for discovery and trial.

---

[12] The Complaint further alleges: "Relator Vargas heard many either irate phone calls, and witnessed actual visits to the locations by, irritated patients who complained about the back-stock of supplies they keep receiving every month .. When asked if they ever spoke with anyone from the company prior to these shipments being made, the response was usually 'NO.' In many instances, a call would be made to the patient and a message would be left on the patient's answering machine. If the patient did not respond to the message, the supplies would be shipped. In most cases, the extra supplies would not be taken back (or refunded to Medicare/Tricare) because no supply item can be returned if 30 days has past." *Id.,* ¶ 68, A-29.

36

Dated: May 20, 2024                    **CUNEO GILBERT & LADUCA, LLP**

/s/ *Monica Miller*
MONICA MILLER
DANIEL M. COHEN
4725 Wisconsin Ave NW, Suite 200
Washington, D.C. 20002
Telephone: (202) 789-3960
E-mail:
monica@cuneolaw.com
danielc@cuneolaw.com

*Counsel for Appellants*

37

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument in this case.

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,640 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: May 20, 2024                    /s/ *Monica Miller*
                                       Monica Miller

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit on May 20, 2024 using the appellate CM/ECF system. Registered CM/ECF users participating in the case will be served by the appellate CM/ECF system..

<u>/s/ *Monica Miller*</u>
Monica Miller